SMALL, J.T.C.
This case requires that I determine the proper application of N J.S.A. 54:32B-14.1b, which provides an exemption from the New Jersey Sales and Use Tax (N.J.S.A. 54:82B-1 to -29) for certain purchases of gas from other than a regulated utility (“non-utility *224 gas”) by a corporation which commenced purchasing non-utility gas in New Jersey during July 1995. That determination depends on the deference to be paid to a notice issued by the Director, Division of Taxation on November 17, 1997 and analysis of the meaning of the cited statute.
The statute reads in relevant part as follows:
An eligible person shall determine and certify to the director ... a base level of volume as of December 31, 1995 ... which shall be equal to the average ammal volume of natural gas units purchased by the eligible person from any non-utility and delivered, but such computation shall not include any purchases delivered prior to January 1, 1992, provided however, that the base level of volume of an eligible person other than a co-generation facility shall be reduced on an annual basis beginning in 1999 by multiplying the base level of volume as of December 81, 1995 by the following reduction ratios: 0.8 in 1999, 0.6 in 2000, 0.4 in 2001 and 0.2 in 2002. In 2003 and thereafter there shall be no exemption for purchases of natural gas by an eligible person other than a co-generation facility.
[N.J.S.A. 54:32B-14.1b (emphasis added).]
The key words from the quoted statute are “average annual volume.” It is the plaintiffs position that the term means the volume of gas units purchased in the first month in which plaintiffs operations achieved full capacity (October 1997), times twelve. In the alternative, plaintiff argues, the phrase means the purchase of gas in the last month of 1995, times twelve. The Director’s position, consistent with his November 17, 1997 notice, is that the proper measure is the total purchases in 1995. After analysis of both the history and the logic of the statute, I have concluded that, although a disinterested observer might conclude that neither the Director’s nor the plaintiffs interpretation is the “best” one, the Director’s interpretation is not unreasonable. The Director has published a reasonable interpretation of the statute. In the absence of adopting that interpretation, the law provides no alternative. The two alternative interpretations suggested by the taxpayer are both less reasonable than the Director’s.
My analysis starts with the facts, then discusses the history of the enactment of N.J.S.A. 54:32B-14.1 by L. 1997, c. 162. I then discuss each party’s interpretation of the statute. Finally, I address those issues raised by the parties with respect to the deference which should be paid to the Director’s November 17, 1997 Notice, in light of the administrative law of the State of New *225 Jersey, as interpreted by several cases, including Metromedia v. Director, Div. of Taxation, 97 N.J. 313, 478 A.2d 742 (1984).
The matter has been submitted on stipulated facts. R. 8:8-1(b). Both parties have moved for judgment on those facts. I have reviewed the briefs, the stipulation of facts, and the arguments of counsel. For the reasons expressed below I have determined that the Final Determination of the Director should be upheld.
I.
Plaintiff, Continental Gypsum Co., is a foreign corporation authorized to do business in New Jersey since 1995. In 1995 plaintiff installed gas burning equipment at its principal place of business, located at 265 Distribution Street, Newark, New Jersey. In July 1995 plaintiff began purchasing and accepting delivery of non-utility natural gas, and in September 1995 commenced production.
It is not disputed that plaintiffs purchases of non-utility natural gas in 1995 were as follows:
1995 Therms Purchased
July 1,270
August 25,940
September 63,570
October 106,350
November 153,070
December 122,870
Total 1995 purchases 473,070.
The parties have stipulated that in 1996 plaintiff purchased and accepted 3,399,160 therms of non-utility natural gas, and in 1997 plaintiff purchased and accepted 4,820,116 therms of non-utility natural gas. It is agreed that plaintiff reached full production capacity in October 1997, during which month it purchased 461,411 therms of non-utility natural gas.
Plaintiff challenges a determination made by the Director that N.J.S.A. 54:32B-14.1 (L. 1997, c. 162, § 34) directs a calculation of plaintiff’s base volume at 473,070 therms of non-utility natural gas *226 purchases (actual 1995 purchases). Plaintiff argues that the calculation should be based on its purchases in October 1997 annualized, or 5,586,932 (461,411 x 12) therms. Alternatively, plaintiff asserts that the calculation should be based on an annualization of December 1995 purchases, or 1,474,440 (122,870 x 12) therms. Further, plaintiff challenges the manner in which Director exercised his authority to arrive at a formula for calculating base level volume.
II.
On July 14, 1997 N.J.S.A. 54:32B-14.1 was enacted, to be effective January 1, 1998. L. 1997, c. 162, § 34. On November 17, 1997 the Director issued a Public Notice in the New Jersey Register, entitled “Notice to Industrial and Commercial Purchasers of Natural Gas.” 29 N.J.Reg. 5029(b). In the notice, the Director described N.J.S.A. 54:32B-14.1 and the requirements of eligibility for the relief it provides from sales tax. The Director explained the computation involved in arriving at the sales and use tax exemption allowed by the statute.
On December 15, 1997 plaintiff sent a letter to the New Jersey Division of Taxation, Audit Services, applying for a direct pay certificate for the sales tax on non-utility natural gas purchases. Plaintiff requested that the base level volume be calculated based on October 1997 volume annualized, 5,536,932 (461, 411 x 12) therms, because that was when full production was finally reached.
By letter dated July 23, 1998 the Director advised plaintiff that, based on the application, a base level volume of 473,070 therms was to be used. This was the actual volume purchased by plaintiff in the 1995 calendar year. The calculation was made based upon the Director’s interpretation of N.J.S.A. 54:32B-14.1. See 29 N.J.Reg. 5029(b).
On August 27, 1998 plaintiff made a timely protest of the 'Director's calculation, contending that it contradicted both the plain language and the legislative intent of the statute, specifically, the meaning of the term “average annual volume” of non-utility natural gas purchases.
*227 On October 7, 1998 an informal conference was held between the parties. On October 14, 1998 plaintiff wrote a letter to the Director restating its position. On October 30, 1998 the Director replied, citing direct language of N.J.S.A. 54:32B-14.1, and rejecting plaintiffs assertion. On January 28 and February 3, 1999 telephone conferences were held between the parties.
On February 10,1999 the Director issued a Final Determination upholding the base level volume computation at 473,070 therms. Plaintiff filed a timely appeal to this court on May 5, 1999. R. 8:4-1(b).
III.
Assembly Bill No. A-2825 was co-sponsored by New Jersey Senate President Donald DiFrancesco and Assemblyman Richard Bagger. It was introduced in the Legislature as part of a policy initiative to change the way utilities and their customers were taxed in New Jersey.
New Jersey’s current energy taxes are among the highest in the nation. To reduce the adverse economic effect of high energy taxation rates on all consumers; to prevent the erosion of tax revenues, annually distributed to municipalities, by energy market changes; and to promote economic development and job growth in the State: this bill, effective for 1998, eliminates the current gross receipts and franchise tax as collected by electric, gas and telecommunications utilities. Instead, electric, gas and telecommunications utilities will be subject to the State’s corporation business tax. The State’s existing sales and use tax will be applied to most retail sales of electric and natural gas (the excepted sales concern municipal electric utilities and companies, and power users who self-generate or co-generate power; provisions of the bill concerning restrictions of certain exemption provisions to “one on-site end user” will be broadly interpreted when applied to affiliated companies operating on the same site). A transitional energy facility assessment will be applied on electric and gas utilities. This assessment will be phased out over five years.
[Assembly Appropriations Comm., Statement to Assembly Bill No. 2825 (June 19, 1997).]
N.J.S.A. 54:32B-14.1 was part of that legislative package. It imposes a sales tax on all purchases of natural gas. These purchases are taxed at a rate of six percent. N.J.S.A. 54:32B-14.1 c; N.J.S.A. 54:32B-3. The relevant part of N.J.S.A 54:32B-14.1 states as follows:
*228 a. As used in this act, “eligible person” means any person other than a co-generation facility as defined in this act whose last purchase and delivery of natural gas on or before December 31,1995 was from a non-utility,____
b. An eligible person shall determine and certify to the director, and satisfactorily document to the director, a base level of volume as of December 31, 1995 ..., which shall be equal to the average annual volume of natural gas units purchased by the eligible person from any non-utility and delivered, but such computation shall not include any purchases delivered prior to January 1, 1992, provided however, that the base level of volume of an eligible person other than a co-generation facility shall be reduced on an annual basis beginning in 1999 by multiplying the base level of volume as of December 81, 1995 by the following reduction ratios: 0.8 in 1999, 0.6 in 2000, 0.4 in 2001 and 0.2 in 2002. In 2003 and thereafter there shall be no exemption for purchases of natural gas by an eligible person other than a co-generation facility.
[N.J.S.A. 54:32B-14.1.]
The tax benefit conferred upon eligible persons, defined at N.J.S.A. 54:32B-14.1a, is a five year, declining exemption from sales tax, which runs from 1998 through 2002. N.J.S.A. 54:32B-14.1b. The exemption is based on the base level of volume. Thus, a larger base level of volume results in a larger exemption and a smaller tax liability. There is no exemption in 2003 and thereafter. Ibid. The eligible person pays “any tax due on purchases of delivered ‘non-utility gas’ from January 1, 1998 through December 31, 2002, inclusive, directly to the Division on an annual basis.... Any tax paid on gas purchases that do not exceed the Base Level of Volume will be refunded accordingly.” 29 N.J.Reg. 5029(b).
The statute is clear that a person eligible to receive the sales tax exemption must have been in business and purchased natural gas from a non-utility prior to December 31, 1995. N.J.S.A. 54:32B-14.1a. Having commenced production and purchased non-utility natural gas in 1995, plaintiff meets this criterion, and is thus an “eligible person” under the statute. Ibid. The Director does not dispute this assertion.
IV.
At issue is the calculation of base level of volume. N.J.S.A. 54:32B-14.1a and b. Plaintiff argues that N.J.S.A. 54:32B-14.1 directs that the calculation of base level of volume should be based on plaintiffs purchases in its first month of full productivity, October 1997, annualized, or 5,536,932 (461,411 x 12) therms. *229 Alternatively, plaintiff asserts that the calculation should be based on an annualization of December 1995 purchases, or 1,474,440 (122,870 x 12) therms.
The Director asserts that the plain meaning of the statute, see Merin v. Maglaki, 126 N.J. 430, 599 A.2d 1256 (1992), as well as the Director’s Notice, 29 N.J.Reg. 5029(b), mandate that base level of volume be calculated using the actual purchases in calendar year 1995. The Director’s Notice states in pertinent part:
To compute the BLV [base level of volume], the eligible person shall divide the total volume of “non-utility gas” purchased and delivered between January 1, 1992 and December 31, 1995, inclusive, by the number of those years that the eligible person actually purchased “non-utility gas.” For example, if the eligible person purchased “non-utility gas” at anytime during each calendar year between 1992 and 1995, inclusive, the total volume of gas will be divided by four; if “non-utility gas” was purchased only during 1993, 1994 and 1995, the total volume will be divided by three; if “non-utility gas” was purchased only during 1994 and 1995, the total volume will be divided by two; if “non-utility gas” ivas purchased only during 1995, the total volume will equal the. BLV. If the eligible person did not purchase “non-utility gas” in any given calendar year between 1992 and 1995, inclusive, that year would not count in the computation.
[29 N J.Reg. 5029(b) (emphasis added).]
Therefore, the Director, in arriving at the exemption under N.J.S.A. 54:32B-14.1, calculated that plaintiffs base level of volume is 473,070 therms, its actual 1995 purchases.
As a threshold matter I conclude that plaintiffs contention that any year after 1995 can be used to calculate base level of volume is incorrect. N.J.S.A. 54:32B-14.1b clearly states that “such computation shall not include any purchases delivered prior to January 1, 1992.” Further, the tax exemption is calculated using a “base level of volume as of December 31, 1995.” Ibid. Thus, N.J.S.A. 54:32B-14.1b, for purposes of calculating base level of volume, allows only non-utility natural gas purchases by eligible persons that took place after January 1, 1992 and before December 31, 1995. Only those purchases that fall within that time frame will be considered. The Director contends that plaintiffs base level of volume was 473,070 therms, those actually purchased. Plaintiff contends that it is unreasonable to use total purchases, but instead the Director should have used December 1995 pur *230 chases annualized, 1,474,440 (122,870 x 12) therms, a difference of 1,001,370 therms.
As support for annualizing the December 1995 purchases, plaintiff quotes from a December 18, 1997 letter written after publication of the Director’s notice of November 17, 1997 by Assemblyman and Majority Conference Leader Richard H. Bagger (co-sponsor of the legislation) to the then New Jersey State Treasurer, James DiEleuterio:
While the Division of Taxation notice recognizes the December 31, 1995 grandfather date, the calculation of the base level of volume provided in the notice is inconsistent with the legislative intent: Specifically, I thought that once a purchaser demonstrated that they met the December 31, 1995 grandfather date, they would be able to annualize their natural gas purchases. For example, if a customer commenced purchasing non-utility supplies on December 1, 1995, they could use their annual usage for that year as their base level of volume and not just their usage for December.
The Division’s interpretation of the statute would allow the customer in this situation to use only their December volume thereby greatly restricting the effect of the grandfathering provision.... Under the Division’s interpretation only those customers who commenced purchases on January 1 of any year'between 1992 and 1995 would be able to grandfather their annual volumes. This result is inconsistent with the grandfathering provision as intended.
[Letter from Assemblyman Richard H. Bagger to James DiEleuterio, New Jersey Sate Treasurer (December 18,1997).]
Plaintiff also argues that this letter allows for the use of the October 1997 purchases, but as discussed previously, that interpretation is incorrect. It appears that the grandfathering provi-, sion was made to give the greatest benefit to those companies that were in business in New Jersey for the greatest amount of time. Plaintiff was operating in New Jersey for only a short period of time during the grandfathering period. For example, a company which commenced business six months after the plaintiff in January 1996, and before the effective date of the Legislation, January 1, 1998, would be ineligible for any benefit under the grandfathering provision of the statute.
On January'14, 1998, Mr. DiEleuterio responded to the letter from Assemblyman Bagger; stating that the language in the statute “accomplishes the goal of enabling the consumers who were purchasing tax-free gas to continue to enjoy a tax benefit, based on the actual volume of gas that was purchased tax free ” *231 (emphasis added). Mr. DiEleuterio further stated that “absent a legislative change, I believe that the Division of Taxation has acted reasonably and appropriately given the explicit terms of the current law” (emphasis added).
I am not bound by the statement of an individual legislator regarding part of a single statute, made subsequent to the passing of an entire legislative package. Assembly Statements, contemporaneously written, “are better guides to legislative intent than the views of individual legislators....” State v. Yothers, 282 N.J. Super. 86, 105, 659 A.2d 514 (1995) (Skillman, J., dissenting) (citation omitted). The United States Supreme Court has stated:
In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature’s intent lies in the Committee Reports on the bill, which “represen! t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation . ” We have eschewed reliance on the passing comments of one Member .
[Garcia v. United States, 469 U.S. 70, 76, 105 S.Ct. 479, 483, 83 L.Ed.2d 472, 478 (1984), reh'g denied, 469 U.S. 1230, 105 S.Ct. 1235, 84 L.Ed.2d 371 (1985) (alterations in original) (citations omitted).]
 “Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction.” Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 380-81, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371, 383 (1969) (footnote omitted). However, a less formal type of subsequent history, such as the letter from Assemblyman Bagger, “provide[s] an extremely hazardous basis for inferring the meaning of a congressional enactment.” Consumer Product Safety Comm’n v. GTE Sylvania, Inc., 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766, 778 (1980). Although he was a co-sponsor of Bill A-2825, Assemblyman Bagger’s statements cannot be construed as the “considered and collective understanding” of the entire New Jersey Legislature. Garcia, supra, 469 U.S. at 76, 105 S.Ct. at 483, 83 L.Ed.2d at 478.
There are several reasonable alternatives which can be used in computing base level of volume. Actual purchases divided by the number of years in operation between 1992 and 1995, as asserted by the Director, is reasonable. Further, actual purchases can be annualized, meaning that the 473,070 therms plaintiff purchased over 6 months can be annualized to 946,140 therms. It is also *232 reasonable to apply total purchases over the four-year grandfathering period, 1992 through 1995, resulting in any purchases over that period (whether annualized or not) being divided by four, which would greatly reduce the amount of exemption allowed in this case.[1] Nevertheless, the Director chose a methodology which I find is reasonable and consistent with the statute.
There is no authority permitting me to implement a method of calculation that I may find to be more reasonable.
“I A] basic tenet of judicial review' is that the courts are not free to substitute their judgment as to the wisdom of a particular administrative action for that of the agency so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable:
. If there is any fair argument in support of the course taken [by the agency] or any reasonable ground for difference of opinion among intelligent and conscientious officials, the decision is conclusively legislative, and will not be disturbed unless patently corrupt, arbitrary or illegal. Doubts held by the court as to the wisdom of the administrator’s decision do not alter the case____
[New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562-63, 384 A.2d 795 (1978) (alterations in original) (citations omitted).]
Courts have recognized the Director’s expertise in the highly specialized and technical area of taxation. Metromedia v. Director, Div. of Taxation, supra, 97 N.J. at 327, 478 A.2d 742. Further, courts accord substantial deference to the interpretation an agency gives to a statute that the agency is charged with enforcing. Menu v. Maglaki, supra, 126 N.J. at 436-37, 599 A.2d 1256; see also Cedar Cove, Inc. v. Stanzione, 122 N.J. 202, 212, 584 A.2d 784 (1991). The Tax Court, in Aetna Burglar & Fire Alarm Co. v. Director, Division of Taxation, 16 N.J.Tax. 584 (1997), citing Metromedia, supra, 97 N.J. at 327, 478 A.2d 742, found that the Director's construction of a tax statute, “which is not plainly unreasonable and -with which the Legislature has not interfered, is entitled to prevail.” Aetna Burglar & Fire Alarm Co., 16 N.J.Tax at 589 (emphasis added). The Legislature has not interfered with the Director’s construction of this statute, more *233 than two years after both the publication of the Director’s November 17, 1997 notice and the rejection of Assemblyman Bagger’s December 1987 interpretation by the State Treasurer in January 1998.
An administrative agency may not extend a statute to give it a greater effect than its language permits. Kingsley v. Hawthorne Fabrics, Inc., 41 N.J. 521, 528, 197 A.2d 673 (1964). Regulations that undermine the intent of the Legislature have been invalidated. See, e.g., In re Adoption of N.J.A.C. 7:26B v. New Jersey Dep’t of Environmental Protection, 128 N.J. 442, 450, 608 A.2d 288 (1992); Fedders Fin. Corp. v. Director, Div. of Taxation, 96 N.J. 376, 892, 476 A.2d 741 (1984); Service Armament Co. v. Hyland, 70 N.J. 550, 563, 362 A.2d 13 (1976). The Director has not extended the statute in this case. The Director’s construction is reasonable, as it is surely not “plainly unreasonable.” Plaintiff has failed to demonstrate that the Director’s interpretation is unreasonable.
Y.
Plaintiffs other argument against the Director’s interpretation is that the Public Notice in the New Jersey Register represents de facto rule-making, which is not allowed under the Administrative Procedures Act. N.J.S.A. 52.1413-1 to -15 (“APA”). Metromedia, supra, 97 N.J. at 328-37, 478 A.2d 742.
Whether formal rule-making procedures must be invoked depends on whether the agency action can be characterized as a “rule.” An agency’s action constitutes a “rule” when it is a formal expression or statement of administrative policy effectuating the agency’s statutory authority... N.J.S.A. 52:14B-2(e) provides: “ ‘Administrative rule’ or ‘rule’ when not otherwise modified, means each agency statement of general applicability and continuing effect that implements or interprets law or policy . ”
[George Harms Constr. Co., Inc. v. New Jersey Turnpike Auth, 137 N.J. 8, 53, 644 A.2d 76 (1994).]
In Metromedia, supra, the Director, during the course of an audit, decided to allocate the income and net worth [2] of a broad *234 casting corporation to New Jersey based on the ratio of the broadcaster’s New Jersey audience to its national audience pursuant to N.J.S.A. 54:10A-8. In the absence of that special allocation, the statute provided for a three-factor formula based on the average of the ratios of New Jersey sales, property, and payroll to national sales, property, and payroll. N.J.S.A. 54:10A-6. This court, and, ultimately, our Supreme Court, held that this special allocation, which was a departure from the standard allocation, required the adoption of a regulation under the APA and could not be validly adopted in the course of an audit. Metromedia, Inc. v. Director, Div. of Taxation, 3 N.J. Tax 397 (1981), rev’d 187 N.J.Super. 562, 455 A.2d 561 (App.Div.1983), rev’d 97 N.J. 313, 478 A.2d 742 (1984). Despite the finding that the Director's determination was reasonable in Metromedia, our Supreme Court still invalidated the Director’s determination because it violated the standards considered when determining whether an agency should use administrative rule-making.
Reuben H. Donnelley Corp. v. Director, Div. of Taxation, 128 N.J. 218, 607 A.2d 1281 (1992), also involved a taxpayer corporation that maintained a regular place of business outside of New Jersey and was subject to the Corporation Business Tax on only that portion of its net income and net worth that was fairly attributable to its corporate activity in New Jersey. The issue in that case, as in Metromedia, was whether the Director had validly modified the three-factor formula of N.J.S.A. 54:10A-6.
In 1982, the Corporation Business Tax was amended to exclude “safe harbor leased” property from the allocation formula. N.J.S.A. 54:10A-4(k), L.1982, c. 50, § 1. The Director determined that Donnelley’s “safe harbor leased” property should be excluded from the property fraction in the allocation formula for tax years 1983 and 1984. Reuben Donnelley Corp., supra, 128 N.J. at 222, 607 A.2d 1281. Donnelley sought review of the Director’s determination, contending that the Director’s position with respect to the property fraction of the business allocation factor was contradicted by an existing regulation, N.J.A.C. 18:7-8.1. The Tax Court upheld the Director’s determination. 11 N.J.Tax 241 (1990). The Appellate Division reversed. 12 N.J.Tax 255 (App.Div.1991). Our *235 Supreme Court reversed the Appellate Division and reinstated the judgment of the Tax Court, finding that:
The Tax Court correctly found that no rule or regulation was necessanj for the following reasons: first, that the change in the Director’s position was specifically dictated by the 1982 amendments; second, that N.J.A.C. 18:7-8.1 was not a “definitional regulation” but merely an instruction on the manner in which the property fraction was to be computed; and last and most important, the Director’s conclusion that [safe harbor leased] property should be excluded from the property fraction was “plainly inferable” from the 1982 [Corporation Business Tax] amendments. 11 N.J.Tax at 258.
[Reuben Donnelley Corp. v. Director, Div. of Taxation, supra, 128 N.J. at 230-31, 607 A.2d 1281 (emphasis added),]
The court found that the Director’s exclusion of “safe harbor leased” property followed both the statute and its own “clear', past ... position on the identical subject matter....” Id. at 232„ 607 A.2d 1281 citing Metromedia, Inc. v. Director, Div. of Taxation, supra, 97 N.J. at 331, 478 A.2d 742.
Not all “rulings” by the Director require the formalities of the rule-making procedures prescribed by the APA. There are two types of agency rule-making, interpretive rules and legislative rules. Interpretive rules are “rules or statements issued by an agency to advise the public of the agency’s construction of the statutes and rules which it administers.” Kenneth Culp Davis, Administrative Law Text, § 5.03 at 126 (3d ed.1972) (citation omitted). In contrast, a legislative rule or regulation is issued pursuant to proper procedure and has the same force as a statute. Ibid. In Richard’s Auto City, Inc. v. Director, Div. of Taxation, 12 N.J.Tax 619 (1992), rev’d, 14 N.J.Tax 436 (App.Div.1994), rev’d, 140 N.J. 523, 659 A.2d 1360 (1995), this court found that N.J.A.C. 18:7-5.13(b) was an interpretative, not a legislative, regulation, explaining:
[A] legislative regulation [is] an exercise of legislative power by the Director in accordance with a delegation of such power by the Legislature, as was the case in Metromedia v. Director, Div. of Taxation, 97 N.J. 313, 334, 478 A.2d 742 (1984)....[A]n interpretative regulation . . construes the authorizing legislation.
[Richard’s Auto City, Inc. v. Director. Div. of Taxation, 12 N.J.Tax at 640, n. 8.]
The Tax Court found the regulation in Richard’s Auto City to be interpretative, because:
[t]he regulation . is merely an interpretation of a previously-existing statute. If the regulation expresses the true meaning of the statute, as I have held that it *236 does, then that is what the statute has always meant and the law has not been changed retroactively. By the same token, if the regulation did not express the meaning of the statute then it is invalid because it is inconsistent with the statute. The regulation at issue is interpretative and not creative. It interprets preexisting statutory law and does not create something new.
[Id. at 640-41, n. 9.]
The Public Notice in this case, issued by the Director, was an interpretative rule. It was issued in accordance with the Director’s obligation to “advise the public of the agency’s construction of the statutes and rules which it administers.” Davis, Administrative Law Text, supra, § 5.03 at 126 (citation omitted). In Metromedia, supra, the Director’s rule was first applied in the course of an audit when the Director had the specific obligation under N.J.S.A. 54:10A-8 to issue a regulation which modified the statutorily prescribed three-factor allocation of N.J.S.A. 54:10A-6.
As the court stated, the manner in which the Director exercised his statutorily conferred discretion was flawed. Metromedia, Inc. v. Director, Div. of Taxation, supra, 97 N.J. at 333, 478 A.2d 742. The adjustment to the allocation formula was made during a 1978 audit of tax years 1972-1975. Id. at 321, 478 A.2d 742. The Director gave no prior notice to the taxpayer as to the position that would be taken years after the tax returns were filed. Further, the statute allowed for a specific alternative. If the Director’s action was invalidated, the statute still allowed for a method of calculating the allocation factor. N.J.S.A. 54:10A-6 and -8. The Director’s allocation, on audit, was made with that statutory structure already in place.
There were several other reasons underlying the finding by the Supreme Court in Metromedia that the Director’s action was an invalid rule. First, although the audience factor was conceptually reasonable, there was no specific proof in that regard. Metromedia, supra, 97 N.J. at 335, 478 A.2d 742, (citing Metromedia, supra, 3 N.J.Tax at 414). Further, the Court cited a statement from the Committee on State Tax Policy, stating that the subject matter was of a legislative or quasi-legislative nature and therefore suitable for rule-making. Metromedia, Inc. v. Director, Div. of Taxation, supra, 97 N.J. at 335-6, 478 A.2d 742, (citing Report of the New Jersey Tax Policy Committee, Part V, at 32 (February *237 23, 1972)). Finally, the Court looked to the Tax Court’s reasoning that a determination made based upon an audit is the Director’s ultimate conclusion as to a single taxpayer’s personal liability in that individual case. The determination was that Metromedia owed additional franchise taxes; however, it was effectively a rule of general applicability which “will apply generally to all similarly situated broadcasters, and which implements and interprets both law and public policy.” Id. at 336, 478 A.2d 742, (citing Metromedia, supra, 3 N.J.Tax at 406).
In this case, plaintiff argues that the Director’s computation is one of general applicability, that applies prospectively to similarly situated persons, and therefore constitutes de facto rule-making under Metnnnedia. Plaintiff urges the invalidity of the Director’s determination because it is based upon a rule not adopted in accordance with the APA. The ‘Tule” which plaintiff contends was improperly adopted was the November 17, 1997 Public Notice appearing in the New Jersey Register concerning the Director’s calculation of base level of volume. Plaintiff argues that the legal shortcoming of the Director’s action is the failure to provide for the procedural requirements of N.J.S.A. 52:14B-4. These procedural requirements ensure fairness by providing public notice, an opportunity for all interested parties to be heard, full factual development, and the opportunity for continuing comment on the proposed action before a final determination is made.
The manner in w'hich the Director exercised his discretion was not, as in Metromedia, during an audit of an individual taxpayer. It was by way of a notice to all similarly situated taxpayers, prior to the statute’s effective date. The Director did not know of plaintiff’s position before issuing the Public Notice. In this case, if the Director’s action is invalidated, the statute provides for no alternative calculation.[3] The statute, although ambiguous, allows for a reasonable determination to be made. The Director’s deter- *238 miration was reasonable. The procedures required by the APA are not warranted in this case.
The Legislature did not intend that the APA should impose unreasonable restraints upon the assessment of taxes by requiring that the validity of every assessment should be contingent upon the prior adoption of a regulation. Such an interpretation would require defendant to adopt regulations to meet every conceivable contingency that might arise in the context of future tax assessments, and would also jeopardize tax revenues which the Legislature directed the Division of Taxation to collect. The APA was not meant to supplant defendant’s authority to assess and collect taxes, an authority explicitly granted to him by N.J.S.A. 54:32B-24(6). Indeed, the APA expressly excludes from its coverage “agency decisions and findings in contested cases,” N.J.S.A. 52:14B-2(e)(3), a category which undeniably embraces tax assessments.
[Airwork Serv. Div. v. Director, Div. of Taxation, 2 N.J.Tax 329, 341-42 (1981), aff'd o.b. per curiam, 4 N.J.Tax 532 (App.Div.1982), aff'd, 97 N.J. 290, 478 A.2d 729 (1984), cert. denied 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).]
I have already found that the Director’s calculation is reasonable, and there is no proof that it is unreasonable.
It is a fundamental maxim that the opinion as to the construction of a regulatory statute of the expert administrative agency charged with the enforcement of that statute is entitled to great weight and is a “substantial factor to be considered in construing the statute.” Such judicial deference to the administrative interpretation of a statute is even more appropriate “when the case involves the construction of a new statute by its implementing agency.” This deference is, of course, not total, as the courts remain the “final authorities” on issues of statutory construction and are not obliged to “rubber stamp” their approval of the administrative interpretation. This Court may appropriately follow the FDA’s reasonable interpretation of the meaning of FDCA § 521(a) in considering the explicit preemption issue, since there are no “compelling indications that it is wrong.”
[New Jersey Guild of Hearing Aid Dispensers v. Long, supra, 75 N.J. at 575-76, 384 A.2d 795. (citations omitted).]
Rule making under the APA was not required. The publication of the November 1997 Public Notice was essential because the statute alone provided for several alternative constructions. Unlike the allocation made under N.J.S.A. 54:10A-6 of the Corporation Business Tax (see Metromedia, Inc. v. Director, Div. of Taxation, supra, 97 N.J. 313, 478 A.2d 742), this section of the sales tax (N.J.S.A. 54:32B-14.1b) provides no precise guidance to calculation of the base level of volume. In the absence of a precise statute and a formal rule, the Director must act to interpret the statute.
Subsequent to the Director’s publication of the November 1997 Public Notice and the exchange of correspondence between As *239 semblyman Bagger and the State Treasurer, in which the validity of the Director’s method of calculation found in the Public Notice was confirmed, the legislation was not amended. With the passage of more than two years, that inaction constitutes implicit acceptance of the Director’s interpretation by the Legislature.
I have found the Director’s determination to be (a) reasonable and (b) more reasonable than either of the alternative interpretations proposed by the taxpayer. I have found no requirement that the Director’s pre-audit determination be adopted by a formal regulation.
Under these circumstances, I decline to substitute the arguments of the plaintiff or my judgment for the determination of the Director. Accordingly, the Director’s Final Determination of base level of volume of 473,070 therms is affirmed.

 I note that any calculation other than (a) the annualizing of each year's purchases, in which actual purchases were made, (if purchases were not made in all months of the year), or (b) dividing total purchases in the four year (1992-1995) period by four, will penalize those purchasers who, like plaintiff, purchased non-utility gas in some, but not all, months of a given year.

 At the time of the Metromedia decision, the Corporation Business Tax had a net income and a net worth component. The tax on net worth was eliminated, effective July 1, 1985, by L.1982, c. 55. N.J.S A 54:10A-5(a).

 There are no statements from any committees, nor is there any legislative history, stating or suggesting that the subject matter is of a legislative or quasi-legislative nature suitable lor iormal rule-making rather than as an interpicfative rule not subject to the formalities of adoption of a legislative rule.